IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 06-285-1 |
| | : | |
| KAREEM MILLHOUSE | : | |

<u>**MEMORANDUM**</u>

**Judge Juan R. Sánchez**                                                                                                       **May 2, 2025**

      Kareem Millhouse, who is currently serving an 894-month sentence in this case, has moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Millhouse argues a sentence reduction is warranted based on a nonretroactive change in the law that reduced the statutory penalties for some of his crimes and because he is not receiving adequate care for his medical conditions in prison. Because neither of the asserted grounds qualifies as an extraordinary and compelling reason for relief, and because the relevant sentencing factors under 18 U.S.C. § 3553(a) do not support a sentence reduction in this case, the motions will be denied.

**BACKGROUND**

      Over the course of seven weeks in 2006, Millhouse engaged in a series of increasingly violent robberies throughout the City of Philadelphia. Millhouse participated in six robberies, four with a co-defendant and two on his own, and brandished a firearm during three of the robberies, firing shots in the last one. Following a five-day jury trial in March 2007, Millhouse was convicted of three counts of bank robbery, in violation of 18 U.S.C. § 2113(a); two counts of armed bank robbery, in violation of 18 U.S.C. § 2113(d); one count of Hobbs Act robbery, in violation of 18 U.S.C. § 1951; and three counts of using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). He was later sentenced to 894 months of imprisonment, consisting of 210 months on each of the six robbery counts, to run concurrently,

followed by the statutory mandatory minimum consecutive sentence on each of the three § 924(c) counts: 84 months for the first § 924(c) offense, plus 300 months for each of the second and third § 924(c) offenses, for a total consecutive sentence of 684 months.[1] Millhouse appealed, and his judgment of conviction was affirmed by the Third Circuit on October 23, 2009.

Millhouse is also serving another federal sentence for offenses relating to his attempted sexual assault of his female court-appointed defense attorney while he was awaiting trial in this case. Following a bench trial, Millhouse was found guilty of all charges related to this assault and was sentenced to 300 months in custody, with 120 months to be served consecutively to his sentence in this case. Am. J., *United States v. Millhouse*, No. 06-397 (E.D. Pa. Feb. 20, 2008), ECF No. 145. Millhouse is currently 48 years old. With an anticipated release date of January 8, 2080 (according to the Federal Bureau of Prisons (BOP) inmate locator), he is serving an effective life sentence.

From 2020 to 2022, Millhouse moved for compassionate release on numerous occasions primarily for medical reasons relating to the risk of harm from COVID-19 and for issues relating to his trial. All of these previous motions have been denied. *See* ECF Nos. 236, 244, 247, 266, 303, 309, 310, 315, 329, 250.

In 2023, Millhouse was transferred from USP Coleman in Coleman, Florida to USP Victorville in Adelanto, California, where he is currently serving his sentence. On December 27, 2023, Millhouse filed a new pro se motion for compassionate release under 18 U.S.C.

---

[1] At the time Millhouse was sentenced, § 924(c) included a "stacking" provision that "required a defendant to be sentenced to a 25-year minimum sentence for each § 924(c) violation after the first, even if the defendant was convicted for [multiple violations] at the same time." *United States v. Rutherford*, 120 F.4th 360, 368 n.10 (3d Cir. 2024), *petition for cert. filed*, No. 24-820 (Feb. 3, 2025).

§ 3582(c)(1)(A), seeking relief based on (1) a nonretroactive change to the penalty provision of § 924(c) under which his sentence for the § 924(c) offenses in this case would be significantly lower, (2) his receipt of inadequate and ineffective medical care at USP Victorville, and (3) the poor prison conditions at USP Victorville. ECF No. 358. As to his medical care, Millhouse asserted that despite submitting over 150 sick call requests, he had never been evaluated by sick call at USP Victorville and had received no chronic care follow up for his medical conditions—including "serious diagnosed spinal conditions," pain, hemorrhoids, and a broken left hand—since May 2023. *Id.* at 2. Millhouse filed another pro se motion for compassionate release on August 29, 2024, citing the prison's failure to evaluate him for chronic care for over 16 months and noting he suffers from numerous medical conditions, including carpal tunnel syndrome, spinal injuries, defecating blood, severe stomach pain, and severe weight loss. ECF No. 376 at 1-2. He also alleged the prison could not consistently supply him with the pain medication Lyrica. *Id.* at 2. Most recently, Millhouse filed a supplemental compassionate release motion on February 10, 2025, alleging he has not been provided the supplemental diet he requires due to a diagnosed stomach ailment and has been continuing to lose weight. ECF No. 387 at 1. He asserts he was not fed for 17 consecutive meals in December 2024 and passed out on December 9, 2024, sustaining injuries to the back of his head. *Id.* at 1-2. Millhouse also asserts he is not receiving prescribed medications and his sick call requests are going unanswered. *Id.* at 2.

      The Government has filed an opposition to each of Millhouse's motions. The Government argues the Third Circuit's recent decision in *United States v. Rutherford*, 120 F.4th 360 (3d Cir. 2024), forecloses Millhouse's request for compassionate release based on the change in the sentencing provision of § 924(c). ECF No. 381. As to Millhouse's allegations regarding his medical care, the Government maintains Millhouse's prison medical records reflect that his

3

medical conditions are being adequately treated by the prison and his medical circumstances do not qualify as an extraordinary and compelling reason for relief in any event. ECF No. 363 at 13-17; ECF No. 377 at 6-15; ECF No. 389 at 3. Finally, the Government asserts Millhouse's complaints about prison conditions are not a proper basis for compassionate release. ECF No. 363 at 18.

**DISCUSSION**

A sentencing court has limited authority to modify a term of imprisonment it has imposed. A court may not modify a term of imprisonment, except as expressly permitted by statute or by Federal Rule of Criminal Procedure 35. *See United States v. Washington*, 549 F.3d 905, 916 (3d Cir. 2008) (recognizing that 18 U.S.C. § 3582(c) and Rule 35 "define the full scope of the district court's power to correct a sentence"); 18 U.S.C. § 3582(c) (providing a court "may not modify a term of imprisonment once it has been imposed," except as set forth in § 3582(c) or "to the extent otherwise expressly permitted by statute or by Rule 35").

Here, Millhouse invokes the Court's authority pursuant to the compassionate release provision of 18 U.S.C. § 3582(c)(1), which provides, in relevant part, that a court

> may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; . . .
>
> . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A). In other words, a court may grant a motion for compassionate release if the defendant shows "the sentence reduction is (1) warranted by 'extraordinary and compelling

4

reasons'; (2) 'consistent with applicable policy statements issued by the Sentencing Commission'; and (3) supported by the traditional sentencing factors under 18 U.S.C. § 3553(a), to the extent they are applicable." *United States v. Andrews*, 12 F.4th 255, 258 (3d Cir. 2021) (quoting 18 U.S.C. § 3582(c)(1)(A)); *see also United States v. Fields*, 569 F. Supp. 3d 231, 235 (E.D. Pa. 2021) ("The defendant bears the burden of showing relief is warranted.").[2]

The applicable policy statement is set forth at U.S.S.G. § 1B1.13, which describes various categories of circumstances in which extraordinary and compelling reasons would exist.[3] Two provisions of § 1B1.13 are particularly relevant here: subsection (b)(6), addressing when a defendant's "unusually long sentence" may qualify as an extraordinary and compelling reason, and subsection (b)(1), addressing when extraordinary and compelling reasons exist based on the defendant's medical circumstances.

Millhouse's argument that a sentence reduction is warranted based on a nonretroactive change to the penalty provision of § 924(c) implicates subsection (b)(6) of the policy statement,

---

[2] The compassionate release statute also includes an exhaustion requirement for prisoner-initiated motions. A defendant may move for compassionate release after he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Millhouse asserts he has submitted numerous requests to the warden to submit a motion on his behalf, yet received no response after 30 days. ECF No. 358 at 3. The Government does not dispute this.

[3] Previously, only the BOP could move for compassionate release on behalf of a prisoner. *Rutherford*, 120 F.4th at 365. Consistent with this restriction, earlier versions of the policy statement were limited to BOP-initiated motions and were thus not binding on courts considering prisoner-initiated motions. *Id.* In 2023, however, the Sentencing Commission issued an amended policy statement "to define 'extraordinary and compelling reasons' for prisoner-filed motions for compassionate release." *Id.* at 366. Insofar as it is applicable, the Court applies the new policy statement here. *Cf. id.* at 375 (recognizing the Sentencing Commission's "policy statements are generally binding on [the courts]").

which provides that a defendant's "unusually long sentence" may qualify as an extraordinary and compelling reason for a sentence reduction in the following circumstances:

> If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

U.S.S.G. § 1B1.13(b)(6).

As noted, Millhouse was sentenced to a total of 684 months (or 57 years) for his three § 924(c) offenses under the statute's then-applicable "stacking" provision, which mandated a 25-year minimum consecutive sentence for each § 924(c) violation after the first, even if the violations were part of the same case. In 2018, however, the statute was amended to eliminate the stacking requirement by limiting the 25-year minimum consecutive sentence to § 924(c) violations occurring "after a prior [§ 924(c)] conviction . . . has become final." First Step Act of 2018, Pub. L. No. 115-291, § 403(a), 132 Stat. 5194, 5221-22 (2018). This change in the law was not retroactive. *See id.* § 403(b), 132 Stat. at 5222. But had Millhouse been sentenced after the First Step Act was enacted, he would have faced a mandatory minimum consecutive sentence of no more than seven years for the second § 924(c) violation (in which the firearm was brandished) and no more than ten years for the third violation (in which the firearm was discharged)—i.e., 17 years rather than the 50 he received for these two offenses.[4]

---

[4] A § 924(c) violation carries a five-year mandatory minimum sentence, which must run consecutively to the sentence imposed for the underlying crime of violence. 18 U.S.C. § 924(c)(1)(A)(i). The mandatory minimum sentence is increased to seven years if the firearm is brandished, and ten years if the firearm is discharged. *Id.* § 924(c)(1)(A)(ii)-(iii).

Citing the disparity between the sentence he is serving on the § 924(c) counts and the sentence that would likely be imposed for those counts today, given the change in the law, Millhouse asks the Court to resentence him to time served on the § 924(c) counts. ECF No. 358 at 1. As the Government notes, however, this argument is foreclosed by *Rutherford*. In that case, the Third Circuit held that allowing the change to § 924(c) to be considered in determining whether a defendant presents an extraordinary and compelling reason for release under subsection (b)(6) conflicts with Congress's explicit decision not to apply this change in the law retroactively. 120 F.4th at 376. The Court of Appeals thus concluded this change in the law "cannot be considered in the analysis of whether extraordinary and compelling circumstances make a prisoner eligible for compassionate release." *Id.* at 380. In light of *Rutherford*, the change in § 924(c)'s penalty provision does not constitute an extraordinary and compelling reason for release.[5]

Regarding a defendant's medical circumstances, subsection (b)(1) of the policy statement provides that extraordinary and compelling reasons exist if, inter alia:

> (A) [t]he defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), endstage organ disease, and advanced dementia[;]
>
> (B) [t]he defendant is—
>
>   (i) suffering from a serious physical or medical condition,
>
>   (ii) suffering from a serious functional or cognitive impairment, or
>
>   (iii) experiencing deteriorating physical or mental health because of the aging process,

---

[5] As noted, the defendant in *Rutherford* has filed a petition for a writ of certiorari in the United States Supreme Court. This Court's denial of Millhouse's request for compassionate release based on his unusually long sentence does not prevent him from seeking relief on this ground in the event *Rutherford* is overturned.

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover[;] [or]

(C) [t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

U.S.S.G. § 1B1.13(b)(1).

In his motions, Millhouse argues compassionate release is warranted based on the prison's failure to provide adequate medical care for his numerous medical conditions. In particular, he cites the prison's failures to: respond to sick call requests, provide him with chronic care evaluations at six-month intervals as warranted by his medical conditions, provide him with the supplemental diet he requires due to stomach issues, and provide him with prescribed medications, including the pain medication Lyrica (known generically as pregabalin). The Government has produced Millhouse's prison medical records from approximately April 2023 (shortly after he was transferred to USP-Victorville) to January 2025. ECF Nos. 364, 378, 390.[6] The records confirm that Millhouse suffers from numerous medical conditions. They also document the care Millhouse has received for his medical issues while at USP Victorville. However, they do not establish—and Millhouse has not otherwise shown—that his medical conditions currently qualify as an extraordinary and compelling reason for release under the policy statement.

The medical records show that following his transfer from USP Coleman to USP Victorville, Millhouse was evaluated by a physician in the Chronic Care Clinic on May 4, 2023. *See* ECF No. 364 at 28-30. At the evaluation, Millhouse complained of pain in his "lower back

---

[6] In citing to Millhouse's medical records, the Court adopts the pagination supplied by the ECF system.

going down [the] left leg," in both hands due to carpal tunnel syndrome, and in his right ankle, as well as wheezing at night due to asthma. *Id.* at 28. The physician also noted that Millhouse had a history of gunshot wounds; that electromyography "showed demyelinating distal peripheral neuropathy affecting [the] right sural nerve at [the] ankle" as well as bilateral carpal tunnel syndrome; and that Millhouse had "L5-S1 radiculopathy" with an x-ray showing "L5 S1 fusion and intact hardware." *Id.*

At the time of the evaluation, Millhouse's diagnoses included carpal tunnel syndrome, antisocial personality disorder, asthma, flat foot, hyperlipidemia, hypermetropia, hypertension, low back pain, and nerve pain/neuralgia neuritis/radiculitis. *Id.* at 29. He was prescribed medication for many of these medical issues, including an albuterol inhaler for asthma, amlodipine and lisinopril for hypertension, atorvastatin for hyperlipidemia, and several pain medications—ibuprofen, pregabalin, and oxcarbazepine—for nerve pain, neuralgia neuritis, radiculitis, flat foot, acquired spondylolisthesis, other low back pain, carpal tunnel syndrome, and unspecified joint pain and radiculopathy. *Id.* at 32-33. In addition to renewing Millhouse's prescription for pregabalin, the physician ordered x-rays of Millhouse's chest and hands as well as lab work and an EKG. *Id.* at 29-30. The x-rays were performed the same day. The chest x-ray showed "[n]o radiographic evidence for an acute cardiopulmonary process." *Id.* at 128. The hand x-rays revealed a "9 mm cyst within the proximal pole of the scaphoid" and a "3 mm corticated osseous fragment adjacent to the tip of ulnar styloid with an additional punctate calcific density" on the right and "[s]oft tissue swelling around the third finger PIP joint" on the left. *Id.* at 27, 126. Based on the x-ray results, Millhouse was referred to the hand surgeon clinic for further evaluation. *Id.* at 27. It is not clear whether Millhouse received an EKG. Millhouse refused lab work in September 2023 and January 2024, and refused two dental care appointments in December 2023. *Id.* at 114-19.

After his chronic care evaluation in May 2023, Millhouse submitted numerous written complaints to prison staff regarding his need for further chronic care evaluation and treatment for various medical conditions. Among other things, he asserted he was defecating blood and mucus, complained of stomach pain, weight loss,[7] increased pain in his lower back, hand, knee, and feet, and noted lapses in his receipt of his pain medication pregabalin. *See, e.g.*, ECF No. 375 at 20-22, 38-39; ECF No. 376 at 6, 8, 10.[8]

In April 2024, Millhouse was seen twice at sick call. On April 10, 2024, he complained of worsening pain in his right wrist, right ankle, and lower back, and reported the current dose of his pain medication was not working. ECF No. 378 at 24. On examination, he was found to have decreased active and passive range of motion and decreased strength in the affected areas as well as a mild limp/lean toward the affected leg. *Id.* The provider noted MRI and hand surgery consultations had previously been submitted[9] and adjusted Millhouse's pain medications, increasing his oxcarbazepine dose and adding a prescription for amitriptyline (also known by the

---

[7] Although Millhouse also complained of defecating blood, stomach pain, and weight loss before his chronic care evaluation in May 2023, ECF No. 375 at 44; ECF No. 376 at 9, these complaints do not appear to have been mentioned during the evaluation.

[8] In written complaints submitted in December 2021, October 2022, and October 2023, Millhouse also alleged he was assaulted and/or sexually assaulted by correctional officers. *See* ECF No. 375 at 25-28; ECF No. 376 at 12-14. While these allegations are troubling, Millhouse does not assert the assaults are a basis for compassionate release and does not satisfy the standard for obtaining compassionate release as a victim of abuse. *See* U.S.S.G. § 1B1.13(b)(4) (providing that sexual abuse or physical abuse committed by or at the direction of a correctional officer may qualify as an extraordinary and compelling reason for release if the misconduct is "established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger").

[9] An MRI appears to have been requested in 2022, before Millhouse's transfer to USP Victorville. ECF No. 364 at 64.

brand name Elavil), as Millhouse was already receiving the maximum dose of pregabalin.[10] *Id.* at 24-25. On April 24, 2024, Millhouse was seen in clinic for a complaint of rectal bleeding during bowel movements two times per week. *Id.* at 21-22. He indicated he had been diagnosed with internal hemorrhoids but denied any aggravating symptoms. *Id.* at 21. The provider ordered lab tests as well as an EGD (i.e., an upper endoscopy) and colonoscopy with "routine" priority. *Id.* at 22.

On September 11, 2024, Millhouse was seen at the Chronic Care Clinic, where his primary complaints were severe lumbar pain, rectal bleeding, and a large external hemorrhoid. *Id.* at 6. After examining Millhouse, the physician submitted a routine referral for physical therapy for his back pain, carpal tunnel syndrome, and other pain, and adjusted his pain medications, discontinuing ibuprofen (due to his "GI bleed") and amitriptyline (which was not working), and adding Tylenol 3 for better pain management. *Id.* at 8, 10-11. The physician also adjusted Millhouse's other medications, discontinuing one blood pressure medication (amlodipine) due to low pulse rate and atorvastatin for hyperlipidemia, and adding a new medication (omeprazole) for esophageal reflux. *Id.* at 8-10. In addition, the physician referred Millhouse to the Desert Valley Hospital emergency room for a "workup," including a CT scan of the lumbar spine due to his severe back pain and pedicle screw fracture,[11] as well as an upper and lower GI endoscopy to rule out any possible pathology due to his history of rectal bleeding, recent weight loss, chronic epigastric pain, and family history of cancer (mother). *Id.* at 8, 11. The endoscopy request was

---

[10] Millhouse's medications had been renewed the previous month. ECF No. 378 at 28.

[11] The physician noted Millhouse had undergone a "fusion of the L5-S1 Pedicle screw and rod fusion" in 2017 and that a 2022 lumbar x-ray revealed the "bilateral shafts of the S1 pedicle screws are broken." ECF No. 378 at 8.

submitted with urgent priority. *Id.* at 11. The physician also noted Millhouse needed hemorrhoidal surgery the "sooner the better" and requested a lab workup. *Id.* at 8.

The day after this chronic care evaluation, Millhouse was transported to the hospital where he underwent a physical exam, blood work, a "[m]ultidetector spiral CT of the abdomen and pelvis" with contrast, a diagnostic colonoscopy, and an upper endoscopy with biopsy over a period of several days. *See id.* at 95-153. During his hospital stay, Millhouse was assessed as having hematochezia (i.e., rectal bleeding); hematemesis (i.e., vomiting blood); anemia; a history of hypertension, asthma, and lumbar disk disease; and constipation. *Id.* at 111, 126, 137. He was prescribed medication for these conditions. *Id.* The CT scan showed "[n]o acute abdominal or pelvic finding." *Id.* at 124, 126. The colonoscopy found "[t]race to 1+ internal hemorrhoids" but was otherwise normal with no masses, colitis, diverticular disease, or polyps noted and no fresh or old blood in the colon. *Id.* at 95-96. Following the procedure, Millhouse was advised to undergo a repeat colonoscopy in 10 years, resume a regular diet, and "follow up with Hematology Oncology if anemia recurs as no GI source of anemia could be identified." *Id.* at 96. The endoscopy noted a "[s]lightly irregular squamocolumnar junction with minimal grade a erosive esophagitis," but was otherwise normal with "no active bleeding [and] no fresh or old blood in the stomach." *Id.* at 98. During the procedure, duodenal, gastric, and GE junction biopsies were obtained. *Id.* at 99. The physician prescribed Protonix, a medication for conditions causing too much stomach acid, and advised Millhouse to resume a soft mechanical diet and advance as tolerated; discontinue aspirin, NSAIDs, smoking, and alcohol; and follow up in four to six weeks to review biopsy results. *Id.* at 99.

On September 20, 2024, upon Millhouse's return from the hospital, prison health services submitted a request for an offsite follow up gastroenterology appointment to review the biopsy

results of his endoscopy.[12] ECF No. 390 at 28. An oncology consultation was also requested based on the recommendation to follow up with an oncologist if anemia persists. *Id.* at 27.

Since returning from the hospital, Millhouse was seen at sick call on October 21, 2024 for worsening lower back pain, at which time the provider requested an MRI for further evaluation of his worsening radiculopathy. *Id.* at 22-23. A prison physician ordered additional lab work and a fecal occult blood test in November 2024. *Id.* at 15. Upon receiving the test results, which showed Millhouse was still anemic, the physician prescribed iron supplements and folic acid tablets and requested additional lab tests. *Id.* at 13. Millhouse was again seen at sick call on December 12, 2024 for worsening abdominal pain. *Id.* at 6. During the visit, he also reported nausea, poor appetite, regurgitation, constipation, and weight loss. *Id.* After reviewing the records of Millhouse's hospital admission, the provider confirmed he had lost weight, added a medication (famotidine) for reflux symptoms, and indicated he would await the hematology/oncology report for further management. *Id.* at 6, 8.

Most recently, on January 16, 2025, Millhouse was seen by a physician from "cCARE"— California Cancer Associates for Research & Excellence—for a consultation regarding his iron deficiency anemia with rectal bleeding and hemorrhoids. *Id.* at 115. Millhouse's physical examination was unremarkable. *Id.* at 116. The physician noted his impression was "[m]icrocytic hypochromic anemia consistent with iron deficiency probably from rectal bleeding." *Id.* He recommended blood work, including an iron panel; suggested using IV Injectaefer for the symptomatic anemia; and recommended that Millhouse be evaluated regarding the possibility of

---

[12] It is not clear whether this follow up appointment occurred. However, the records of Millhouse's hematology-oncology consultation in January 2025 indicate that "the EGD pathology showed moderate chronic inactive gastritis from the stomach biopsy." ECF No. 390 at 115.

surgery to help his hemorrhoids. *Id.* Following the consultation, prison health services requested the recommended lab tests and noted the onsite provider would be informed about the results, counseling, consultation, and follow-up care. *Id.* at 1. Millhouse refused lab work on January 21, 2025. *Id.* at 104. As of February 12, 2025, Millhouse's ongoing prescription medications included an albuterol inhaler for asthma, lisinopril for hypertension, pregabalin and oxcarbazepine for pain, famotidine and pantoprazole (generic for Protonix) for acid reflux and related concerns, and folic acid.[13] *Id.* at 99-103.

While Millhouse's medical records document his numerous medical issues, his medical circumstances do not present an extraordinary and compelling reason for release under the policy statement. First, there is no evidence Millhouse suffers from a "terminal illness" within the meaning of U.S.S.G. § 1B1.13(b)(1)(A)—i.e., "a serious and advanced illness with an end-of-life trajectory." Given his history of rectal bleeding, weight loss, and chronic epigastric pain, Millhouse underwent series of procedures in September 2024 to rule out any possible pathology. He then saw a hematologist/oncologist in January 2025, whose clinical impression was that Millhouse's anemia is "consistent with iron deficiency probably from rectal bleeding." ECF No. 390 at 116. Although Millhouse has been seen by numerous specialists in the past seven months, none have diagnosed a terminal illness.

Second, Millhouse has not established, and his medical records do not show, that he is suffering from a serious physical or medical condition that substantially diminishes his ability to provide self-care within the environment of a correctional facility and from which he is not expected to recover. *See* U.S.S.G. § 1B1.13.(b)(1)(B). Courts have interpreted "self-care" in this

---

[13] Although Millhouse was prescribed a 120-day supply of iron tablets, ECF No. 390 at 13, he appears to have received only a four-day supply, *id.* at 100.

context to refer to an inmate's ability "to provide for his own activities of daily living, such as eating and drinking, toileting, washing and dressing, and mobilization." *United States v. Barron*, No. 95-088-2, 2022 WL 2383973, at *3 (D.D.C. July 1, 2022) (citation omitted); *see also United States v. Jarvis*, No. 20-561-1, 2024 WL 3039952, at *2 (N.D. Ohio June 18, 2024) (holding self-care refers to "the ability to independently carry out standard daily living tasks such as dressing, eating, or taking prescribed medication"); *United States v. Bolze*, No. 09-093-1, 2020 WL 6151561, at *9 (E.D. Tenn. Oct. 20, 2020) (same), *aff'd*, 2021 WL 1978362 (6th Cir. Apr. 6, 2021). Millhouse has not shown his medical conditions impair his ability to independently carry out the activities of daily living.

Lastly, Millhouse has not shown that any of his medical conditions require long-term or specialized medical care that is not being provided by the prison and without which he is at risk of a serious deterioration in health or death. *See* U.S.S.G. § 1B1.13(b)(1)(C). In his compassionate release motions, Millhouse cites the lack of care for medical conditions including carpal tunnel syndrome, spinal injuries, defecating blood, severe stomach pain, and severe weight loss. ECF No. 376 at 3; *see also* ECF No. 358 at 2. As described above, however, Millhouse's medical records show he has been receiving ongoing care for his rectal bleeding, stomach pain, and related issues, both inside the prison and from outside specialists, including lab work, diagnostic procedures, and medication. *See United States v. Radulescu*, No. 19-651, 2024 WL 5220421, at *1 (S.D.N.Y. Dec. 26, 2024) (finding extraordinary and compelling reasons were not present under U.S.S.G. § 1B1.13(b)(1)(C) where medical records contained "multiple medical appointments with BOP staff members, including medical doctors, the prescription of various medications, as well as referrals to outside medical specialists for consultations and tests, including visits with a pulmonologist" (citation omitted)). The medical records also show Millhouse is receiving ongoing

15

care for his hand and back pain. Hand x-rays were taken in May 2023, Millhouse underwent a CT scan of his pelvis in September 2024, his pain medications have been regularly renewed and adjusted, and an MRI was ordered in October 2024.[14] While Millhouse may not have received all recommended interventions to date,[15] there is no indication he is at risk of a serious deterioration in health or death as result.

Millhouse also alleges the prison has failed to provide him a "supplemental diet" and claims he now weighs less than 150 pounds. ECF No. 387 at 1. His medical records do not support these assertions. When he was seen at sick call on December 12, 2024, the provider noted the GI specialists had recommended he resume a normal diet and recorded his weight at 184 pounds.[16] ECF No. 390 at 6-7; *see also* ECF No. 378 at 96, 99. And while he was not weighed at his cCARE appointment, the examining physician described him as "nourished." ECF No. 390 at 115.[17]

---

[14] Regarding his pain medications, in August 2024, Millhouse alleged the prison had been unable to consistently supply the medication Lyrica (i.e., pregabalin). ECF No. 376 at 3. As the Government acknowledges, Millhouse's medical records reflect lapses in his receipt of pregabalin during the period from February 2023 to January 2025. See ECF No. 364 at 69-81; ECF No. 378 at 48-62; ECF No. 390 at 61-75. In most instances, the lapses lasted only a few days, though several lasted a week or more. In any event, these lapses are not a basis for compassionate release as they do not constitute a failure to provide long-term or specialized medical care without which Millhouse is at risk of serious deterioration in health or death.

[15] It is not clear, for example, whether Millhouse was evaluated by a hand surgeon, as recommended in May 2023, though a consultation was apparently scheduled for November 2024. *See* ECF No. 377 at 12. It is also not clear whether his September 2024 referral for physical therapy for back pain, carpal tunnel syndrome, and other pain was completed.

[16] The provider noted Millhouse's "[w]eight loss trend," ECF No. 390 at 6, which is supported by entries in his medical records showing he weighed 219 pounds in May 2023 and 184 pounds in December 2024, ECF No. 364 at 28, 66; ECF No. 390 at 7.

[17] There is no support in the record for Millhouse's assertion that he was not fed for 17 straight meals in December 2024, causing him to pass out and sustain a head injury. *See* ECF No. 387 at 1-2. There is no record of a medical emergency on December 9, 2024. And when Millhouse was seen at sick call three days later on December 12, 2024, it was for abdominal pain, not a head injury. ECF No. 390 at 6.

16

Although Millhouse suffers from numerous medical conditions, his medical circumstances do not present an extraordinary and compelling reason to reduce his sentence at this time. The Court recognizes that Millhouse has concerns regarding the adequacy of the medical care he is receiving in prison. Because his medical conditions do not present a basis for compassionate release, however, Millhouse must pursue those concerns through the BOP's administrative process set forth in 28 C.F.R. § 542.10 et seq. *See, e.g.*, *United States v. Grant*, No. 18-34, 2022 WL 558347, at *5 (E.D. Pa. Feb. 24, 2022). As the Government notes, the BOP regulations "provide for an expedited response to administrative requests 'determined to be of an emergency nature which threatens the inmate's immediate health or welfare,'" and provide for appellate review within the BOP, following which an inmate may file a civil rights action in the district of confinement. ECF No. 363 at 18 (quoting 28 C.F.R. § 542.18).

Finally, even if Millhouse's medical circumstances qualified as an extraordinary and compelling reason for a sentence reduction, the Court is not persuaded a reduction would be consistent with the relevant § 3553(a) factors, including the "the nature and circumstances of the offense," "the history and characteristics of the defendant," and "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense[,] [and] . . . to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(B). As this Court previously recognized in denying Millhouse's earlier motions for compassionate release, the offense conduct in this case is serious, involving a string of robberies and armed robberies, three of which involved the brandishing or discharge of a gun. Before committing the offenses in this case, Millhouse had accumulated a significant criminal history. And while awaiting trial in this case, he committed another violent offense, threating his female defense attorney with a razor and attempting to sexually assault her. The Government

reports that as of February 2024, Millhouse had committed over 80 disciplinary infractions while in custody and that, in BOP's assessment, he continues to present a high risk of recidivism. ECF No. 389 at 1 n.1. Millhouse has made no effort to rebut these assertions and has presented no evidence of rehabilitation. Thus, while the Court recognizes the mandatory minimum sentence imposed in this case is significantly longer than what would be required for the same offenses today, the § 3553(a) do not support a sentence reduction at this time.

Millhouse has not "clear[ed] the threshold eligibility hurdle" for compassionate release by showing "extraordinary and compelling reasons" for a sentence reduction. Nor has he shown a sentence reduction is consistent with the relevant § 3553(a) factors. Accordingly, his motions for compassionate release will be denied.

An appropriate Order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, J.